David A. Jackson (SBN 030057)
Ryan Pont (SBN 033391)
Lewis Roca Rothgerber Christie LLP
201 East Washington Street, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 262-5311
djackson@lewisroca.com
rpont@lewisroca.com

David J. Stewart (admitted *pro hac vice*)
Sarah H. Parker (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
david.stewart@alston.com
sarah.parker@alston.com

*Attorneys for Plaintiff Hillstone Restaurant Group, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Hillstone Restaurant Group, Inc., a Delaware corporation, | **Case No. 2:22-cv-02004-MTL** |
| Plaintiff, | **PLAINTIFF'S MOTION FOR CONTEMPT AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF** |
| v. | |
| Houston's Hot Chicken, Inc., a Delaware corporation; Houston's Hot Chicken IP Holdco, LLC, a Nevada limited liability company; and Houston Crosta, an individual, | |
| Defendants. | |

Pursuant to this Court's Order dated December 15, 2022 [Dkt. 25] and Federal Rules of Civil Procedure 65 and 70, Plaintiff Hillstone Restaurant Group, Inc. ("Hillstone") files this Motion for Contempt and Preliminary Injunction against Defendants Houston's Hot Chicken, Inc. ("HHC"), Houston's Hot Chicken IP Holdco,

LLC ("HHC IP")[1], and Houston Crosta ("Crosta"; collectively with HHC and HHCIP, "Defendants").

## INTRODUCTION

On October 7, 2022, the parties entered into a written Trademark Settlement Agreement (the "Agreement") to address and resolve a trademark dispute regarding the use by Defendants and their franchisees of the service mark HOUSTON'S HOT CHICKEN. Under the Agreement, Defendants agreed, *inter alia*, to cease all use of the HOUSTON'S HOT CHICKEN mark by November 10, 2022 and to cause its franchisees to do the same.

Defendants elected not to comply with nearly all of their obligations under the Agreement or to cure their breaches after notice, including failing to rebrand their stores and otherwise cease use of the HOUSTON'S HOT CHICKEN mark. Hillstone was thereby left with no option but to file the instant action on November 23, 2022 and move for a temporary restraining order. The Court entered a Temporary Restraining Order on December 1, 2022 ("TRO") requiring, *inter alia*, that Defendants cease use of the HOUSTON'S HOT CHICKEN mark by December 6, 2022 on their website, any social media accounts, exterior signage, in-store displays and menus. [Dkt. 21.]

Defendants have flouted the Court's order and are continuing to use the HOUSTON'S HOT CHICKEN mark in numerous ways that violate the TRO, including in social media posts, on restaurant wall art, signs, displays, and through continued ownership and use of the Instagram account name "houstonshotchicken". There is no reason Defendants could not have timely complied with the TRO; they simply chose not to do so. Defendants are thereby treating the Court's TRO with the same disdain with which they have treated their obligations under the Agreement. Defendants' knowing and willful contempt should be met with material sanctions – as Defendants were warned in

---

[1] Defendants have amended the entity names to HHC Enterprises, Inc. and HHC IP Holdco, LLC. For consistency with the case caption, Hillstone uses the prior entity names herein.

the TRO the Court would do if Defendants failed to comply. Hillstone requests that the Court enter coercive sanctions against Defendants in the amount of $10,000, with an additional $3,000 in sanctions for each day Defendants fail to adhere to the TRO. Hillstone further requests that the Court award Hillstone compensatory sanctions in the form of the fees and expenses Hillstone has incurred in addressing Defendants' acts of contempt.

In addition to being in contempt, Defendants continue to remain in breach of the Agreement in a number of material respects: (1) Defendants are wrongfully continuing to use the marks HOUSTON'S HOT CHICKEN and HOUSTON'S in numerous social media posts on Instagram, TikTok, and LinkedIn; (2) Defendants are continuing to use the Instagram handle "houstonshotchicken"; (3) Defendants are continuing to make prominent use of the HOUSTON'S HOT CHICKEN mark on signs, wall art, displays, and uniforms in their Cerritos, California store; (4) Defendants are continuing to use the HOUSTON'S HOT CHICKEN mark on cups, paper and plastic bags, tray liners, and to-go boxes at all five of their restaurants, including using these items as in-store displays; and (5) Defendants have failed to provide notice to all of their franchisees of the terms of the Agreement and then provide copies of those notices to Hillstone.

Defendants' refusal to comply with their obligations under the Agreement is causing Hillstone and the public substantial and continuing irreparable harm, as Defendants have acknowledged in Section 7 of the Agreement. This harm will continue unless and until Defendants are preliminarily enjoined by this Court. Hillstone therefore respectfully requests that the Court grant this Motion and enter the relief requested in the Proposed Order filed concurrently herewith.

## FACTUAL BACKGROUND

Details regarding the history of Hillstone's HOUSTON's mark and restaurants are set forth in full in Hillstone's prior Motion for Temporary Restraining Order [Dkt. 2]. For the sake of brevity, Hillstone provides only a summary herein.

1      Hillstone owns valid and enforceable rights in the service mark HOUSTON'S,

2 which Hillstone has used continuously in commerce since 1977. (*See* S. Ashby Decl.,

3 Dkt. 8-1 ¶ 211-2 in Case No. 2:22-cv-01646-MTL (D. Ariz.)). The United States Patent

4 and Trademark Office has issued Hillstone three federal service mark registrations for the

5 HOUSTON'S mark for restaurant services (collectively, the "HOUSTON'S Mark"), each

6 of which is valid and incontestable. [*See* Dkt. 2-1 at 8-11.]

7      Defendants, on their own and through franchisees, have opened HOUSTON'S

8 HOT CHICKEN-branded restaurants at the following locations: (1) 1500 N. Green

9 Valley Parkway, Unit #110, Henderson, Nevada 89074 ("Green Valley"); (2) 7155 West

10 Ann Road, Las Vegas, Nevada 89130 ("Ann Road"); (3) 11439 South Street, Cerritos,

11 California 90703 ("Cerritos"); (4) 927 East University Drive, Tempe, Arizona 85281

12 ("Tempe"); and (5) 1910 Village Center Circle #1, Las Vegas, Nevada ("Village

13 Center"). [Dkt. 3-3 at 12-15; Dkt. 3-4 at 1-2.]

14      On September 28, 2022, after Defendants refused to cease use of the

15 HOUSTON'S HOT CHICKEN mark despite lengthy settlement negotiations between the

16 parties, Hillstone filed an action in this Court for, *inter alia*, trademark infringement

17 against Defendants' prior Tempe franchisee, White Boy Racing, LLC, and its members

18 Lindsay White and Tristan White (Case No. 2:22-cv-01646-MTL) (the "Prior Action").

19 [Dkt. 3-4 at 3-8.] Hillstone simultaneously moved for a temporary restraining order and

20 preliminary injunction. [*Id.*] Hours before a status conference with the Court on October

21 6, 2022 regarding Hillstone's motion, Hillstone and Defendants reached agreement on all

22 material terms of settlement and executed the Agreement the next day. (*See* Agreement,

23 attached as <u>Exhibit A</u> hereto.)

24      Pursuant to the terms of the Agreement, Defendants agreed, among other things,

25 to:

26      •     Cease all use of the HOUSTON HOT CHICKEN and HOUSTON'S HOT

27 CHICKEN & Design marks and any other marks or names that include the term

28

"Houston's" or "Houstons" (the "HOUSTON'S HOT CHICKEN Marks") by November 10, 2022 (<u>33 days</u> after execution of the Agreement) (*id.* at Section 1(c));

- Provide notice of the Agreement and its requirements to Defendants' franchisees and provide Hillstone with copies of the notices by November 15, 2022 (<u>38 days</u> after execution of the Agreement) (*id.*); and

- Amend and cause their franchisees to amend any company names that include "Houston's" to new names that do not include that term (*id.* at Section 1(f)).

Defendants failed to timely comply with their obligations under the Agreement or cure their breaches after multiple notices. [*See* Dkts. 2-1 at 13-22.] Accordingly, Hillstone filed the instant action on November 23, 2022 and simultaneously moved for a temporary restraining order to enforce the Agreement's terms. [Dkt. 2, 2-2.]

On December 1, 2022, the Court entered a Temporary Restraining Order requiring Defendants to do the following by December 6, 2022: "remove and cease all use . . . on its website, any social media accounts, exterior signage, in-store displays and menus" of the HOUSTON'S HOT CHICKEN Marks. [Dkt. 21 at 3.] As with their obligations under the Agreement, Defendants elected not to comply with the TRO. As of December 7, Defendants continued to: (1) use the HOUSTON'S HOT CHICKEN Mark in numerous posts on Facebook, Instagram, TikTok, and LinkedIn (Decl. of Kelly Branch ¶¶ 3-4, Exs. 1-2; Decl. of Geoffrey Beams ¶¶ 3-7, Exs. 1-5); (2) own and use the Instagram account name "houstonshotchicken"[2] (Beams Decl. ¶ 4, Ex. 2); (3) use the mark HOUSTON'S on a large mural in their Green Valley store (Decl. of Joy Jones ¶¶ 3-5); and (4) use the HOUSTON'S HOT CHICKEN mark on displays, signs, and wall art in their Cerritos store, including using bags, boxes, and liners as displays. (Decl. of Greer Illingworth ¶¶ 4-12, Ex. 1.) Examples of the continuing use on displays, art and signs are shown below:

---

[2] Defendants deny continuing ownership of the account name, but the content at the top of the account page is Defendants' content, thereby belying Defendants' contention. (See Beams Decl. ¶¶ 4-5, Exs. 2-3, comparing the content at the top of both accounts). Pursuant to the Court's December 15, 2022 Order, Hillstone has served a subpoena on Instagram for account ownership information.

Neon sign in Cerritos:



Wall art in Cerritos:



Display in Cerritos:



Bags lined-up on counter as a display in Cerritos:



Boxes used as display in Cerritos:



Wall art in Green Valley:



Upon information and belief, all of the above violations of the TRO are continuing as of the date of this Motion other than Defendants' Facebook posts and Crosta's Instagram posts, which have been removed, and the Green Valley wall art, which has been temporarily covered. (*See* Illingworth Decl. ¶¶ 4-12, Ex. 1; Beams Decl. ¶¶ 3-7.)

In addition to being in contempt of the TRO, Defendants continue to be in breach of the Agreement in numerous material respects, several of which also violate the TRO:

1.      Defendants are continuing to use the HOUSTON'S HOT CHICKEN Marks in social media posts on Instagram, TikTok, and LinkedIn and continue to own and use the "houstonshotchicken" Instagram handle in breach of Section 1(c) of the Agreement. (Beams Decl. ¶¶ 3-7, Exs. 1-5.)

2.      Defendants and their franchisee are continuing to use the HOUSTON'S HOT CHICKEN Marks on interior signage, wall art, displays, and uniforms in the Cerritos store in violation of Section 1(c) of the Agreement. (Illingworth Decl. ¶¶ 4-12, Ex. 1.)

3.      Defendants are continuing to use the HOUSTON'S HOT CHICKEN Marks on wax paper tray liners, 32 oz. cups, 20 oz. cups, 16 oz. cups, large and small paper

bags, plastic bags, and to-go boxes (collectively, "Paper Products") in violation of Section 1(c) of the Agreement. (Beams Decl. ¶¶ 9-10, Ex. 7.) The cups, bags, and boxes are walking billboards that continue to promote Defendants' restaurants as HOUSTON'S HOT CHICKEN.

4.      Other than a notice purportedly sent to a single franchisee on December 14, 2022 (more than a month after the Agreement deadline), Defendants have failed to provide Hillstone with notices sent to any of their 14 other franchisees as required by Agreement Section 1(c) and as they told the Court they would do at the December 1 TRO hearing. *See* Exhibit B hereto (copy of letter provided to Hillstone by Defendants' counsel). The fact that Defendants have provided only one notice to Hillstone indicates that none of the other notices have been sent, in violation of Agreement Section 1(c).

Defendants had full ability to timely comply with their obligations under the Agreement and TRO but simply chose not to do so. Signs could have been taken down, displays covered, social media posts removed within a few hours or less, and Defendants or their law firms could have readily changed company names and sent out notices to franchisees months ago.

With regard to Paper Products, the fact that Defendants still have a large quantity of products bearing the HOUSTON'S HOT CHICKEN Marks is a problem entirely of their own making. On September 17 and September 23 -- after the parties had already been discussing settlement for several months – Defendants reordered the following quantities of additional HOUSTON'S HOT CHICKEN-branded Paper Products: 400 cases of 20 oz. cups, 250 cases of 32 oz. cups, 750 cases of to-go boxes, 125 cases of wax paper, and 150 cases of plastic bags – facts Defendants conspicuously failed to disclose to the Court at the TRO hearing.  (*See* Exhibit C hereto, email from Defendants' counsel to Hillstone's counsel dated December 8, 2022 with order information.) Moreover, Defendants could have easily secured unbranded replacements for all Paper Products within days. Imperial Dade, a supplier Hillstone uses for Paper Products that supplies restaurants nationwide, advised Hillstone's counsel that it could supply large quantities of

1   unbranded versions of all of the Paper Products within 2-5 days of an order being placed.

2   (*See* Exhibit D hereto). Hillstone submitted an online order for a month's supply of the

3   Paper Products to another national restaurant supplier, Webstaurant Store, and the

4   supplier's website stated that all items could be delivered within 12 days, including delay

5   caused by the Christmas holiday. (Illingworth Decl. ¶¶ 14-17, Ex. 2.)[3]

6         Defendants had 33 days under the Agreement to secure unbranded Paper Products

7   but deliberately chose not to do so. As shown above, Defendants could easily have had

8   unbranded Paper Products in place at all five of their restaurants by the November 10

9   Agreement deadline had they made any effort to honor their legal obligations under the

10  Agreement. And they certainly could have had them in place by now, 38 days after the

11  November 10 deadline and more than 10 weeks after the Agreement was signed. A

12  preliminary injunction should be entered to halt Defendants' continuing breaches of the

13  Agreement, and contempt sanctions should be entered to address Defendants' repeated

14  violations of the TRO.

15        **MEMORANDUM OF POINTS AND AUTHORITIES**

16  **I.**    **Defendants Should be Held in Contempt for Violation of the Temporary**

17       **Restraining Order.**

18        "A district court has the inherent authority to enforce compliance with its orders

19  through a civil contempt proceeding, a wide latitude in determining whether there has

20  been a contemptuous violation of its order, and broad equitable power to order

21  appropriate relief." *Toyo Tire & Rubber Co. v. H.K. Tri-Ace Tire Co.*, 281 F. Supp. 3d

22  967, 984 (C.D. Cal. 2017) (internal citation omitted). "Civil contempt is characterized by

23  the court's desire to compel obedience to a court order or to compensate the contemnor's

24  adversary for the injuries which result from the noncompliance." *United States v. Bright*,

25

26  [3] Hillstone determined the quantities for a one-month supply of each of the Paper Products
    through use of the inventory information provided to Hillstone by Defendants' counsel, attached

27  as Exhibit C. The number of cases needed was determined by calculating the run rate of
    inventory by day in units, multiplying that by 31 days in a month, then dividing that by units per

28  case. Defendants could have reordered until new branded Paper Products arrived.

1   596 F.3d 683, 695-96 (9th Cir. 2010) (internal citation omitted).

2          To establish Defendants are in contempt, Hillstone must show that Defendants
3   "violated the [C]ourt's order by clear and convincing evidence." *In re Dual-Deck Video*
4   *Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Willfulness is not
5   required for civil contempt; Defendants' intent for their noncompliance is immaterial. *See*
6   *United States v. Armstrong*, 781 F.2d 700, 712 (9th Cir. 1986); *Donovan v. Mazzola*, 716
7   F.2d 1226, 1240 (9th Cir. 1983). Instead, "[t]he sole question is whether [Defendants]
8   complied with the district [C]ourt's order." *Donovan*, 716 F.2d at 1240. If Hillstone
9   establishes noncompliance with the TRO, the burden shifts to Defendants to demonstrate
10  why they were unable to comply and to show "they took every reasonable step to
11  comply." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992).

12         The Court's TRO required Defendants to "remove and cease all use of
13  HOUSTON'S HOT CHICKEN or HOUSTON'S HOT CHICKEN & Design marks or
14  any other marks that include the terms 'Houston's' or 'Houstons' (the 'HOUSTON'S
15  HOT CHICKEN Marks') on its website, any social media accounts, exterior signage, in-
16  store displays and menus" by December 6, 2022.  As set forth above, as of December 7,
17  Defendants had not (1) removed all social media posts with the HOUSTON'S HOT
18  CHICKEN mark from their Facebook, Instagram, TikTok, and LinkedIn accounts; (2)
19  deleted and stopped use of the Instagram account name "houstonshotchicken"; (3)
20  stopped use of the HOUSTON'S HOT CHICKEN mark on wall art, signs, and displays
21  in their Cerritos store; or (4) removed HOUSTON'S from a prominent mural in their
22  Green Valley store. As of today, Defendants continue use of the HOUSTON'S HOT
23  CHICKEN mark on Instagram, TikTok, LinkedIn and on signage, displays, and wall art
24  at Defendants' Cerritos, California restaurant. The displays include using bags, boxes,
25  and liners as displays. It cannot legitimately be disputed that Defendants did not comply
26  with the TRO. The burden thus shifts to Defendants to demonstrate why they failed to
27  comply with the TRO and that they took every reasonable step to comply.

28         There is no good faith reason Defendants could not have fully complied with the

TRO. Defendants contended at the Status Conference held on December 14, 2022 that they did not have sufficient personnel to go through all of their social media accounts and delete all offending posts by December 6. That contention does not stand up to scrutiny. All it takes on Instagram to delete a post is to hover the cursor over a post, click on the ellipsis that then appears in the top right corner of the post, and click delete. *See* Beams Decl. ¶ 8, Ex. 6.) This process takes no more than three seconds per post. It is similarly easy to delete posts or content on Facebook, TikTok, and LinkedIn. Crosta, who is a self-styled "influencer" who runs Internet based-businesses and "various YouTube channels" certainly had the knowledge and skill to remove the posts. (Ex. A, Recital ¶2.) Defendants could also easily have found the limited amount of time it would take to delete or change all offending posts by December 6, or they could have hired someone to do it for them. Even easier, Defendants could have deleted all posts and then reposted any posts that do not violate the TRO later. Defendants' contention that they could not timely comply with the TRO, or that they took every reasonable step to comply, is meritless. These posts are Defendants' primary advertising vehicle and reach a nationwide audience. Defendants' willful disregard of the TRO through such prominent, nationwide use of the enjoined mark is causing material continuing harm to Hillstone and the public, as expressly acknowledged by Defendants in Section 7 of the Agreement and by this Court in paragraph 7 of the TRO. [Dkt. 21]. A contempt order and sanctions are therefore "absolutely warranted" in this case. *See Honor Plastic Indus. Co. v. Lollicup USA, Inc.*, 466 F. Supp. 2d 1217, 1224 (E.D. Cal. 2006) (finding sanctions "absolutely warranted" where defendants violated a TRO through continued use of enjoined mark on product advertisements and website and holding itself out as the Plaintiff).

There are two forms of civil contempt sanctions: coercive and compensatory. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). Coercive sanctions are appropriate in this case because, without them, there is no reason to expect Defendants will alter their behavior and come into compliance with the TRO. Hillstone requests that Defendants be sanctioned in the amount of $10,000, with a per

diem sanction of $3,000 thereafter for each day Defendants fail to comply in full with the TRO. *See Honor Plastic Indus. Co.*, 466 F. Supp. 2d at 1225 (awarding $3,000 per diem coercive sanctions in addition to compensatory attorneys' fees and costs). Anything less will not be taken seriously by Defendants who have already shown no regard for their legal obligations under the Settlement Agreement or this Court's orders, and the Court warned Defendants in the TRO that "failure to comply with this Order in full could result in the entry of monetary or other sanctions against them." [Dkt. 21.] Defendants should not be rewarded for ignoring the Court's express warning.

Compensatory sanctions are also appropriate to recompense Hillstone for the attorneys' fees and expenses it has been forced to incur based on Defendants' continued, willful noncompliance with the TRO. *See id.* If granted, Hillstone requests 10 days to submit a fee petition and bill of costs.

Hillstone further requests the Court warn Defendants that any failure to comply with the Contempt Order or a preliminary injunction if it issues could result in terminating sanctions, including the striking of Defendants' Answer. *See Constr. Laborers Tr. Funds for S. Cal. Admin. Co. v. Montalvo*, No. CV 10–01193, 2011 WL 1195892, at *5-6 (C.D. Cal. Mar. 3, 2011) (striking Defendants' answer for continued willful violation of multiple court orders, including a preliminary injunction).

## II.     Defendants Should Be Preliminarily Enjoined from Continued Breach of the Agreement.

To obtain a preliminary injunction, the moving party must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).

### A.     Hillstone is Substantially Likely to Succeed on the Merits of its Breach of Contract Claim.

To establish a breach of contract, Hillstone must show that (1) there is a binding

1    and valid agreement between the parties, (2) a party has breached one or more material

2    terms of the agreement, and (3) and that the non-breaching party has suffered harm as a

3    result of the breach. *First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 353 (2016)

4    (citing *Graham v. Asbury*, 112 Ariz. 184, 185 (1975)).

5           There can be no legitimate dispute the Agreement is valid and binding. The

6    Agreement was fully negotiated between represented parties and is signed by authorized

7    representatives, each of whom warranted that they had the full power and authority to

8    enter into the Agreement. (Ex. A.)

9           As set forth above, Defendants refused to comply with numerous material terms of

10   the Agreement, even after notice and a chance to cure, and have continued to refuse to

11   comply with numerous material terms of the Agreement. Defendants remain in clear

12   breach of at least Sections 1(c) (which requires that Defendants stop use of the

13   HOUSTON'S HOT CHICKEN Marks, give notice of the Agreement to their franchisees,

14   and send copies of the notices to Hillstone) and Section 1(f) (which requires that

15   Defendants change company names to remove "Houston's").

16          There is no reason Defendants could not have complied with their obligations

17   under the Agreement by now. All of the provisions Defendants have breached are

18   material and were critical to Hillstone's willingness to enter into the Agreement. Section

19   1(c) contained the most critical provisions of the Agreement − to ensure Defendants

20   ceased use of the HOUSTON'S HOT CHICKEN Marks by November 10, 2022. By

21   continuing to use the marks on social media and Paper Products, Defendants are

22   continuing to hold their restaurants out as being associated or affiliated with Hillstone's

23   restaurants (all of which offer a crispy chicken sandwich), and are continuing to advertise

24   their restaurants as HOUSTON'S HOT CHICKEN in violation of the Agreement.

25          Defendants' Cerritos franchisee continues to operate its restaurant as though no

26   Agreement were entered into and no rebranding required, continuing to use the

27   HOUSTON'S HOT CHICKEN mark on neon signs, Paper Products, wall art, packaging

28   displays, and employee uniforms. (Illingworth Decl. ¶¶ 4-12, Ex. 1.) Defendants

1    represented through the Agreement they had the ability to cause their franchisees to

2    comply with the Agreement's terms. Specifically, in Section 1(c), Defendants agreed they

3    would, at their sole cost and expense, "pursue diligently and in a timely manner all legal

4    action necessary to ensure the timely compliance by its franchisees with the terms of this

5    Agreement." (Ex. A at 2.) And the one notice Defendants have sent to a franchisee under

6    Section 1(f) of the Agreement makes clear that Defendants have control over their

7    franchisees' use of the HOUSTON'S HOT CHICKEN mark. *See* Ex. C; *see also*

8    *Barcamerica Int'l USA Tr. v. Tyfield Imps.*, 289 F.3d 589, 595-96 (9th Cir. 2002) (a

9    trademark license requires control over use of the mark for license to be valid).

10        The continued use at the Cerritos location evidences precisely why the notice to

11   franchisees required by Section 1(c) of the Agreement is so important to Hillstone.

12   Hillstone has no confidence Defendants' franchisees are even aware of the Agreement or

13   its terms or will comply with them without clear notice and direction from Defendants

14   and potential legal action the Agreement requires Defendants to take against any

15   noncompliant franchisee.

16        Defendants are now using the mark "HHC" in addition to their continuing uses of

17   HOUSTON'S HOT CHICKEN. Hillstone did not in general have a problem with the

18   "HHC" mark provided Defendants timely and fully complied with the Agreement, but

19   Defendants' continued, prominent, and co-existing use of the HOUSTON'S HOT

20   CHICKEN Mark in their restaurants and on social media is now tainting the "HHC" mark

21   so that consumers are being led to understand that HHC means HOUSTON'S HOT

22   CHICKEN. Defendants' Cerritos restaurant is further fostering this understanding by

23   openly saying to customers that HHC means HOUSTON'S HOT CHICKEN, which is an

24   independent violation of Section 1(i) of the Agreement. (Illingworth Decl. ¶ 13; Ex. A.)

25   The agreed timing for Defendants' transition under the Agreement was to prevent this

26   very connection from being made.

27        Defendants contend Paper Products are not covered by the Agreement, but that

28   contention is unfounded. The Agreement plainly and unambiguously prohibits use of the

HOUSTON'S HOT CHICKEN mark for, *inter alia*, restaurant services, take-out services, "any other food and beverage products related to restaurant services," and "any packaging". No credible argument can be made that cups, to-go boxes, and takeout bags are not packaging. Defendants cannot serve a drink without a cup to put it in (and the cup is the packaging for the drink) or provide take-out orders without packaging in the form of boxes and bags to put the food in. All these uses are part and parcel of offering restaurant and take-out services, for which Defendants expressly agreed they would "permanently cease all use of the HOUSTON'S HOT CHICKEN marks" by November 10, 2022. Paper Products are therefore squarely covered by the Agreement. Taken to its logical conclusion, Defendants' position is that they can continue to use the HOUSTON'S HOT CHICKEN mark indefinitely on Paper Products because it is not covered by the Agreement. Hillstone submits this conclusion cannot reasonably be reached through any good faith reading of the Agreement.

Based on the foregoing, Hillstone submits it is substantially likely to succeed on the merits of its breach of contract claim, and Defendants should be ordered to immediately stop all use of the HOUSTON'S HOT CHICKEN Marks in any manner and cause its franchisees to do the same (including, in addition to what is already covered by the TRO, ceasing use on Paper Products and uniforms and stating "HHC" means HOUSTON'S HOT CHICKEN), send the required notices to its franchisees, and provide copies of those notices to Hillstone.

## B. Hillstone Will Suffer Irreparable Harm if Defendants Are Not Enjoined.

Defendants agreed in Section 7 of the Agreement "the breach of any material term of this Agreement will cause irreparable harm to the other Party not in breach. . . ." [Ex. A at 8.] Defendants have thereby conceded that their actions are causing irreparable harm to Hillstone. Even if they had not, the irreparable harm to Hillstone from Defendants' conduct is manifest. Defendants' continuing use of Hillstone's HOUSTON'S Mark in violation of the Agreement is likely to mislead consumers into believing Defendants'

restaurants are operated by, associated or affiliated with, or sponsored or endorsed by Hillstone. Such confusion is likely to cause Hillstone to lose its ability to control the goodwill associated with its HOUSTON'S Mark. The inability of an owner to control the reputation and goodwill associated with its marks creates "substantial and irreparable harm." *See CytoSport, Inc. v. Vital Pharms., Inc.,* 617 F. Supp. 2d 1051, 1081 (E.D. Cal.), *aff'd* 348 F. App'x 288 (9th Cir. 2009) (noting plaintiff's lack of control over its reputation in the market caused plaintiff substantial and irreparable harm). Such damage to reputation and goodwill is difficult, if not impossible, to quantify and reverse after the fact. *Optinrealbig.com, LLC v. Ironport Sys., Inc.,* 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004). For this reason, the Lanham Act provides that irreparable harm should be presumed upon a finding of likelihood of success on the merits for a violation of Sections 32(1) or 43(a) of the Lanham Act on a motion for a preliminary injunction or temporary restraining order. *See* 15 U.S.C. § 1116(a). Accordingly, the harm to Hillstone and its HOUSTON Mark from Defendants' breach of the Agreement is immediate and irreparable and justifies the entry of preliminary injunctive relief.

**C.    The Balance of Equities Weighs Sharply in Hillstone's Favor.**

Where, as here, Defendants have consciously chosen to expressly ignore their duties under a valid and enforceable agreement to continue a false association between their restaurant and Hillstone, the balance of equities strongly favors the entry of injunctive relief. Defendants had no legal right to use the HOUSTON'S Mark in the first place and have contractually committed to ceasing all use of the HOUSTON HOT CHICKEN Marks. Preliminary injunctive relief will do nothing more than require Defendants to honor the obligations they voluntarily undertook in the Agreement. Thus, Defendants can claim no legitimate surprise or harm if the Court enters the relief requested hereunder.

**D.    The Public Interest Requires an Immediate Injunction.**

Courts recognize the public is served by the enforcement of valid contracts, which Plaintiffs request here. *See, e.g.*, *Phoseon Tech., Inc. v. Healthcote*, No. 3:19-cv-2081-SI,

2019 WL 7282497, at *12 (D. Or. Dec. 27, 2019). Further, the public interest in preventing confusion and deception in the marketplace weighs strongly in favor of protecting registered trademarks. *See Brookfield*, 174 F.3d at 1066. Here, Defendants are acting in flagrant disregard of their own contractual obligations that are intended to protect the public from confusion. The public interest will be served by an injunction requiring Defendants' compliance with the Agreement until trial.

## CONCLUSION

For the reasons set forth above, Hillstone respectfully requests the Court hold Defendants in contempt and enter the contempt order and preliminary injunction requested in the Proposed Order filed concurrently herewith. Because of Hillstone's clear likelihood of success on the merits of its claims, it submits that no bond should be required. However, if the Court determines that a bond is necessary, Hillstone requests that it be set in the amount of $10,000 which should be more than sufficient to cover any expenses Defendants could incur.

DATED:  December 19, 2022.

By: */s/ Ryan Pont*
David A. Jackson (SBN 030057)
Ryan Pont (SBN 033391)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
201 East Washington Street, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 262-5311
djackson@lewisroca.com
rpont@lewisroca.com

David J. Stewart (admitted *pro hac vice*)
Sarah H. Parker (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
david.stewart@alston.com
sarah.parker@alston.com

*Attorneys for Plaintiff Hillstone Restaurant Group, Inc.*

17

David A. Jackson (SBN 030057)
Ryan Pont (SBN 033391)
Lewis Roca Rothgerber Christie LLP
201 East Washington Street, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 262-5311
djackson@lewisroca.com
rpont@lewisroca.com

David J. Stewart (*pro hac vice* to be submitted)
Sarah H. Parker (*pro hac vice* to be submitted)
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
david.stewart@alston.com
sarah.parker@alston.com

*Attorneys for Plaintiff Hillstone Restaurant Group, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Hillstone Restaurant Group, Inc., a Delaware corporation, | **Case No. 2:22-cv-02004-MTL** |
| Plaintiff, | |
| v. | **CERTIFICATE OF SERVICE** |
| Houston's Hot Chicken, Inc., a Delaware corporation; Houston's Hot Chicken IP Holdco, LLC, a Nevada limited liability company; and Houston Crosta, an individual, | |
| Defendants. | |

I hereby certify the foregoing Plaintiff's Motion for Contempt and Preliminary Injunction has been filed using the Court's CM/ECF service, which will automatically provide notice to all counsel of record.

1

1    I hereby certify that on December 19, 2022, I served the foregoing **PLAINTIFF'S**

2    **MOTION FOR CONTEMPT AND PRELIMINARY INJUNCTION AND**

3    **MEMORANDUM IN SUPPORT THEREOF** by serving a copy via email to

4    Defendants' counsel of record as follows:

5
                                John L. Krieger, Esq.
6                               jkrieger@dickinson-wright.com

7                               Charles S. Price, Esq.
                                CPrice@dickinson-wright.com
8
                                DICKINSON WRIGHT PLLC
9                               1850 N. Central Ave., Ste. 1400
                                Phoenix, Arizona 85004
10                              Telephone: 602-285-5042
                                Fax: 602-285-5100
11                              cprice@dickinsonwright.com

12

13   This 19th day of December, 2022.

14

15                                      _____/s/ Ryan Pont_____
                                               RYAN PONT
16

17

18

19

20

21

22

23

24

25

26

27

28

2